Good morning, Your Honor. I would like to reserve three minutes. Very well. Thank you very much. May it please the Court, Judge Griffin, Judge Siler, Judge White, I'm Kathleen Caldwell. I represent Sherri Shaw. This is a case that arose in Memphis, Tennessee. Sherri Shaw was employed first in 1986 by the U.S. Postal Service. Throughout her career with the Postal Service, she was a mail processing clerk. There are many terms that we used in the brief that may require more explanation, such as accessing and other such terms. They're exclusive, I believe, to the Postal Service, and they're largely a result of the collective bargaining agreements in the MOUs. I will address any of those that may be pertinent or of concern to the Court. Another thing I'd like to point out about this case is that Ms. Shaw represented herself throughout the matters before the District Court, and there were no depositions taken, at least none to my knowledge. Therefore, the brief is referring mainly to things in the record. The federal government, as this Court well knows, does a very thorough EEO investigation, resulting in an investigative file. And we have relied very heavily on the contents of those investigative files for statements made by certain persons, such as the supervisor of Ms. Shaw and the manager of that post office station. And just so that I know who you're referring to, what are their names? Herman Tate and Ave Williford are the two people that you hear mostly throughout this brief. One thing I would point out is that there's no issue as to the standard review as to the ruling on the summary judgment motions. The standard is de novo. We contend, however, as to our second main issue, which is the order of the District Court requiring the parties to show cause, which resulted in a ruling on summary discretion, and we're relying upon a fairly recent case, Luzon v. Ford Motor Credit from the Sixth Circuit. It's a 2014 decision. In this case, Sherry Shaw alleged that she was being retaliated against because of her protected activities. There is no real issue that she engaged in protected activities. She had done so for a number of years. And she also had acted toward the last year of her employment as an EEO representative for a co-employee. In fact, it was her co-plaintiff. They filed this suit together initially, and the other person was severed from it. And that activity was in February? Pardon? That activity was in February? Yes, I believe that was in February. And I would point out to the Court that there are numerous email chains where she put Tate and Williford on notice that she needed to be at an EEO conference on behalf of Rochelle Johnson, the person she was representing. And they are the very persons who took action against her in one instance within a day, maybe two days, of a request for some time off. I think the Court is well aware of the... Which action was that? I knew you would ask that. I apologize to the Court. I am not certain. I think that that was when she was removed from the facility at Airport Station... And sent to the other facility. And was sent downtown to the main office. But what do you do about the fact that that wasn't their decision? Wasn't that the decision of, I forgot her name, the higher supervisor? Well, that's at issue, Your Honor. The letters ordering her to go elsewhere were signed by Tate and Williford. And the person who allegedly made the decision admitted that Sherry Shaw was not the most junior person on the list. And that is a big fact issue that precludes summary judgment. Where was Sherry Shaw? Was she senior to others? Was she the most junior? And the answer is, according to all of the witnesses that we have relied upon and cited to in the record, she was not the most junior. Wasn't it the union that determined that they were two separate units? No, the union admitted that there were two separate units for their own purposes. But that had nothing to do with Sherry Shaw's case. It really doesn't. There are two types of clerks at airport station. One are the people who serve at the window. They deal with money. They see the public routinely, all day, every day. They're the people we buy postage from. A mail processing clerk does not sell postage. They process the mail in such a way that the delivery persons can deliver it within the scheme in order. But wasn't she the junior most mail processing clerk? No, she was not. And that's exactly what we were pointing out. And in fact, the person who was promoted was junior to Sherry Shaw. I would think that wouldn't be a factual problem at all, that the post office classifies these people and there's no problem. In one of our main exhibits, Your Honor, Judge Saylor, there is an exhibit that we relied upon, which is the seniority list for airport station. And we've provided that to the court. And it shows that Sherry Shaw was not the junior most person. It is a big issue of fact. But that list, doesn't that list include window clerks as well? Yes, it does. But you can separate them out. And that's what anyone in the offices would have to do, is know who's a window clerk and who's not. And does the list itself show that? I don't remember what it shows. I want to be truthful. I don't know as I stand here. I can tell you that Marilyn, I believe her name was Johnson, who supposedly made the decision, admitted that Sherry Shaw was not the junior most person. But I don't, she wasn't the junior most person. But I thought that that was in the context of the combined units. I don't believe so, Your Honor. Okay, the person, there's a person below her name on the list? Yes. Does the record show what her job was, that person? I think we have that in the record, yes. Okay. And in fact, the person who was promoted ahead of Sherry Shaw and who left the unit to go up into a management position, Tawana Simmons, I believe is her name. Tawana was junior to Sherry Shaw. And that was known to all the persons who were in the decision making. Did Shaw apply for that position? I don't remember that anyone applied for that position. She was just promoted. Right. I don't believe it was posted. If it is, it's not in the record that I have seen. Are the people who work in the front and those who just do the mail processing, they all lumped in together as far as seniority is concerned? Are they in separate categories? Each person comes in on a certain date to work within the airport station, and that's their seniority date within that station. The whole office? Yes. Everybody's lumped together? Well... Not by this kind of job or that kind of job. That's right. They're lumped in together, but each one has a different date because they all came in at a different date. But Sherry Shaw's date was certainly not a fairly recent date. She had been at airport station for a good period of time. I think she could have grieved that. They have a union grievance because the postal union is pretty strong. I would think that they would stand up for her if she was picked out as the most junior person when she wasn't. Well, this case has a very convoluted history. Sherry Shaw did, in fact, file grievances. And in one instance, she got some things reversed, which the post office has taken credit for here within the argument of the facts. But in reality, the reversal came as a result of a union grievance. Sherry Shaw not only was a member of the union, she was a union steward. And I'd like to talk about that for just a moment because when it came to retreat rights, and that concept of retreat rights is a little foreign, I know, but she did have retreat rights. The records show that she had retreat rights. She had them not only because she was taken out of a job that had been accessed at airport station, she was a union steward at airport station. And as such, she had something called super seniority, which means that she would be able to come back before anyone came back regardless of who was junior or senior. And that never happened either. I'm jumping a little bit, and I'll be glad to address more questions on issue number one, which is the grant of summary judgment that we believe was wholly inappropriate. But I'd like to talk for just a moment about what happened after that. When Judge Anderson required the parties to show cause why plaintiffs' two remaining claims should not be dismissed or summary judgment granted on them, both parties responded. The problem came that the post office had filed a motion for summary judgment dealing only with retaliation on account of Title VII, and it did not deal with at least two of the claims, one of them being hostile environment based on retaliation, and the second one being intentional infliction of emotional distress. I'm going to take the somewhat unusual position today, and I don't mean it to be contrary to my brief. It is crystal clear that a state tort of intentional infliction is probably barred because of a failure to exhaust administrative remedies. This would be a Federal Tort Claims Act claim, and I don't want to spend this court's time taking that up. But we do have that very valid remaining action on hostile environment. The post office did not choose to make a motion for summary judgment on those two issues, for whatever reason. And Ms. Shaw, a pro se person, did the best she could with all of that. I think I just ran out of time. But you responded, right? I did, yes, I did. I did, and I think that this court needs to reverse. I believe that it was an abuse of discretion of Judge Anderson to have issued that order to show cause, given the fact that both parties had fully explored summary judgment, and given the fact that the post office chose to do what it chose to do. It was represented by a very able counsel, Ms. Hallman, who's present here in court today. And I think that this case should have gone on to trial, perhaps not on intentional infliction. Let's be candid. That's a Federal Tort Claim claim. It didn't happen. But the hostile environment based on retaliation is very viable and should go forward. Why is it an abuse of discretion to issue a show cause? Well, if you look at what happened in Luzon, that's exactly what happened there. In Luzon, there was a motion. And after the motion for summary judgment was denied, the defendant persisted and filed a motion in limine to prohibit evidence from coming in of comparables. And the district court granted that motion. And up on appeal, this court said, no, that was not a proper Rule 56 way to handle this case. The ruling on summary judgment should stand. The motion in limine was not the proper device. It is identical in concept to what Judge Anderson did by using a show cause. He was trying to clear his docket at all costs. And that is not a proper exercise of discretion. I mean, so your position is once there's a ruling that cannot be reconsidered or cannot be looked at again, or what's? Well, I don't think I'd go that far. I would go on to say that that had been a fully argued motion. The court had ruled. The court did not leave any gaps in it. And the court decided that. The motions to reconsider are not allowed under federal practice? Certainly they are. But that's not what we had here. It was not a motion. What's so much different here? Well, I would say it's the same difference as in Luzon. It was a device to allow the federal court to rehear that which it wanted to rehear. It wasn't really rehearing. It was sort of raising another issue. I mean, I can see the frustration where, well, your opponent doesn't raise it. So why is the judge raising it? But I think that district courts are allowed to. I thought that was your argument. But that's not what you're saying. You're saying the judge shouldn't reconsider again. I don't mean to suggest that the judge lacks the jurisdiction to reconsider. I'm saying that. He lacks the jurisdiction to sui sponte, raise issues that the parties haven't raised? I did not say that either. What are you saying then? I think what I'm saying is you don't come in with a new procedural device. In this case, an order to show cause to force the parties into. Why not? I mean, what prohibits it? Well, I think Rule 56 prohibits that. I think Rule 56 says there's going to be a motion. There's going to be a response. There are time limits. There are things that you can say. There are things you can't say. You're supposed to stay within the motions. And then you get a ruling. Is this the 2010 version of Rule 36 that you're talking about? 56? Yeah. Yes, it is. All right. Any further questions? Let's hear from the government or the postmaster. Good morning, your honors. I'm Harriet Hallman here on behalf of the postmaster. I'd like to just clear up a couple of the questions that came up during Ms. Caldwell's presentation. Ms. Shaw did work for the post office for a number of years. However, it is critical to note that she went to the air mail station, airport station. It has had several different names over the years, in November of 2007. And between that time and February 5, 2008, there were no EEO activities. She's not even alleged any EEO activities. And at the time, she got- But wait, she didn't get to that location until November of 07? Yes, your honor. So all that time, where was she until then? She was at various postal facilities. She had worked in two or three different postal facilities. And did she get to this location by virtue of her seniority? She got there because she bid, and her seniority placed her in the position, which is how all- That's where she wanted to work. That's exactly right. After that, you're saying there was no EEO activity by her after 07? Until February. Until the triggering event for this lawsuit is February 8. And what happened on February 8 is either she or Ms. Johnson told either Tate or Williford that they needed to go to a proceeding. That is the only thing that happened. And there was no argument from Tate or Williford. There was no denial. There was no conversation about why are you going, where are you going. It was just an ordinary request for leave, as you would for any other purpose. And then from February 08 until May 08, there was no additional EEO activity. There's no record of it. And there were no problems. There were no acts of retaliation. In fact, there's never any allegation in this lawsuit that either Tate or Williford expressed any dissatisfaction or any concern, one way or the other, about the EEO activity. That did not involve them. The EEO activity that Ms. Johnson and Ms. Shaw were involved in was from wherever she came from. It had nothing to do. So the first thing that happens is she doesn't get some overtime. Overtime in May of 08. And it should be, as the briefs point out, she was called in on that day and asked to work overtime. She was called in the day before. The day before, which is the process. You're called in the day before they want you to come in. And she expressed that it was not her turn to work. So the manager went on to the next person. OK, I'm confused. I thought that we were talking about two different days. I thought that it was the 8th that she wanted, I think. She's got that two days a week off or something, right? So she wanted that date. May 7th is the date that I think she wanted. The dates have been blurry because each person who testified has kind of given different dates. But May 5th is the date she was called in by Mr. Tate to work on May the 6th. And she told them that it's not my turn. Right, but it wasn't this. Now I'm confused. It wasn't the 6th she wanted. It was the 7th. So does that phone call count? I don't know, Your Honor. Mr. Tate testified that he went on down the list after she. OK, so how does that work? So she doesn't get the 7th. But then the next, I wish I had the chart in front of me, the next Tuesday, I think, she doesn't get that either. That's what she's claiming. We know she got some overtime during this period, Your Honor. I think the allegation in this case is she didn't get the dates that she thought she should get based on her place in line, which is the same thing that she told Mr. Tate when he called her. Well, you know, she was dictating what dates. Well, it's not a matter of dictating. My understanding is that you have a list that goes in seniority and you go down the list until everybody's gotten a call and then you start over again. Now, do people only work overtime on their days off or are they also working on their regular days? They can also be asked to work on their regular days. And Mrs. Shaw is not alleging that she didn't get any overtime during that period. And are those the same list or are they different lists? They are the same list. Okay. So you could have a situation where you're getting calls during your work week and you're being checked off the list and then when it comes time to the day off that you want, you've already had your chance. I don't want to answer that question, Your Honor, because I'm not sure that the record is that clear on that specific question. Okay. I mean, actually, all we have is that EEO, is that sheet from the EEO. Okay. But your position is... She was being called for overtime after she exercised whatever right she exercised on February. Well, I know she was being called for overtime, but was she being called for the overtime that she was entitled to? Well, we know between February and May she was. There's no complaint that she wasn't. Right. The only question, and in the EEO complaint, there were only two dates specified, May 7th and July 11th, I believe. Now, this number has grown to 11 without any admissible evidence on that. The only two dates that are appropriately before the court and for which there is any record of is May 7th and June 11th. So we know that she was getting overtime in some increments during that period. And more than that, I do not, on the record, does not... Did she have grieved that through the union if she thought she was being overlooked or... Yes, she could have. Yes, she could have, Judge Seiler. But she didn't do that. That you know of. That I know of, she did not, or that the record shows. I do not know that. But she did complain, right? She complained on the 30th, on May 30th? She complained the first time in the EEO. She complained in an EEO complaint. That's what we know. Is that... Was that May 30th? I believe that was May 30th, Your Honor, but I'm not absolutely certain on that. On the question of whether Ms. Shaw was the junior-most mail processing clerk, she admits that she was throughout the record. There is no question. Even on page 10 of the plaintiff's brief, she says, I was a mail processing clerk. I never did window duties. In order for her to have not been the junior-most person, you would have had to consider all the clerks in the building. The window clerks and the mail processing clerks. When Ms. Shaw turned down the job while she was at the plant, during the time she was excess, and asked why she turned it down, she said, because I was a window... I was a mail processing clerk. One thing is clear in this... Well, two things are clear throughout these proceedings. Ms. Shaw wanted Sundays off, and she wanted to be a mail processing clerk. She testified that she never wanted to be a window clerk. And in fact, the grievance that she filed ultimately got her back to the airport station as a mail processing clerk with the desirable Saturday and Sundays off, even though she did not have the highest seniority for that. This case is directly on point with this court's case decision in Blake v. Potter. Another postal service case where the employee wanted Sundays off. And as this court recognized in that case, Saturdays and Sundays are highly desirable days off. And you have to have a pretty high seniority at the postal service to get that. Ms. Shaw, which seniority controls? Your seniority at the postal service or at that location? At that location, in that section, Your Honor. Classify them in separate sections? Yes. Every craft is different. Letter carriers are different. But you can't fill in for somebody on the front window. That's exactly right. A processing clerk. That is right. There was no crossover in duties at that time. That has subsequently changed. There was no crossover on the overtime desired list. If you look at the overtime desired list that Ms. Shaw complains about, only mail processing clerks are on there. And Ms. Shaw's is the last name on there, indicating that she had the least amount of seniority among the mail processing clerks. There is no dispute that she was the most junior mail processing clerk. And then did you... How did you support your motion for summary judgment? With affidavits or...?  Ms. Shaw testified that she was the least senior mail processing clerk. How did you support your position on the overtime? Well, at that time, Your Honor, we were talking about two days. Two days. That's all we were talking about. And you're basically saying it was de minimis or something. Yes, Your Honor. And that's what the magistrate judge recommended. And that's what the district court ultimately found. However, even if it's determined that it's more than de minimis, there is absolutely no causal connection to any protected activity in that... Say they didn't give her overtime, missed her on some occasion or whatever. There's absolutely no causal connection between that and this obscure thing that happened on February the 5th, her saying, I need to be off work to go to some type of procedure or proceeding. I do want to mention briefly Ms. Caldwell's argument with regard to Luzon. And I think these cases could not be any more dissimilar. Luzon was clearly a case that involved an effort on the eve of trial in a motion in limine to change the process, to stop the wheels, as it were. And the district court granted a motion in limine that really resolved factual and legal issues, not evidentiary issues as is anticipated for motions in limine. What this court said was that's an issue that was more appropriately or should have been dealt with at the summary judgment stage of the litigation. And that's exactly what the district court did here. He dealt with it in the summary judgment stage. Under the new federal rules or under the post-2010 federal rules, everything that the district court did was completely proper. Both sides were given an opportunity to respond. In fact, the plaintiff had raised these issues before. And I admit that we overlooked that issue because there were so many issues involved. This was a pro se case and that issue was just simply overlooked. Had the district court not filed the motion, entered an order to show cause, there was nothing that would have stopped the defendant from filing a motion for leave to file an additional motion for summary judgment. There's nothing in the rules that would have precluded that. And it would have been completely up to the district court to allow that. There's certainly no argument to be made that the district court should allow something to go to trial to a jury for which the court has no jurisdiction in the case of the intentional infliction of emotional distress argument. And on the hostile environment issue, that the court clearly found there was no case. There was no prima facie case of hostile environment. So that is certainly nothing improper about what the district court did with regard to that. I would just say that Ms. Shaw in this case has argued, well, this started out as a religious discrimination and accommodation case. It's clear she wanted Sundays off and a big part of the motion for summary judgment, a big part of the district court proceedings involved that issue. And there are still issues in this part of the case that are left about her getting Sundays off. And there's nothing that allows that. With regard to her retreat rights, the letters that Ms. Shaw got on October 23rd and December 15th clearly told her that her only right to retreat was to a residual vacancy. Ms. Shaw acknowledges that while she was accessed from the airport station, there were no residual vacancies at the airport station. Can you explain what all that means? Yes, Your Honor. A residual vacancy is one, and it is explained very thoroughly in Mr. Piggy's declaration, which is attached at 7212, ID pages 958 and hence. A residual vacancy means that everybody in the section where you left from gets to bid. And if there's a job left over after all of them bid, then the person who has been accessed gets to bid back. Ms. Shaw acknowledges that there were no residual vacancies while she was gone. What she did was wrote letters and tried to create retreat rights where there were none. She had no right to retreat. There was no position for her to retreat to. I would note at this time that... Was there a position that was filled during that time? There were no outside positions filled. What happened after she left, correct the problem as the new postmaster saw it, with these two sections, everybody was required to rebid and make this post office come into alignment with all the stations in Memphis, which cross trains the window clerks and the mail processing clerks. As we've argued, the mail volume was down significantly. They were laying off people, not laying off, but abolishing positions. There was a reduction in effect, and you had to reduce that particular place, right? Well, they did, and then they wanted to make it more efficient. So when they reduced, the first thing they did was treat it like two different, and it was pursuant to that that she was sent elsewhere, right? And that's likewise explained very thoroughly in Mr. Piggy's declaration, the whole history of how that got to... Ms. Shaw acknowledges she doesn't want to say two sections. She says two units. Sometimes she slipped and said section instead of unit. It's pretty clear that those two groups of people were treated differently. Okay, but then after she left, they were combined. They were. There was an attempt made to combine them, and when Ms. Shaw went back as a result of her grievance, she was the only person in the station who had only mail processing duties. And what was the date on that? That would have been July... I'm sorry, June of... I want to say 2012. Let's see. And the claim that she has about retreat rights, what period does that cover? That covers the period from the time she was accessed to the postal plant until she went back to the airport station, whatever date that was. Okay. But she acknowledges there were no residual vacancies, which is the only thing that she was entitled to. Thank you, Your Honors. Thank you. Any further questions? Thank you, Ms. All right. Ms. Caldwell, you have three minutes rebuttal. Thank you. I'm going to go fairly fast concerning the retreat rights. If you look at our brief, pages 18, 19, and 20, it's pretty clear that the post office's own procedures were simply not being followed. There was an in-section bid three days after Ms. Shaw requested retreat rights. That was January of 2009. Another clerk got that bid. Was she already there, though? She was already there and she had no activity. However... Wait, how is that a residual position? Well, I'm admitting that that happened. Okay. I'm not saying that anything but that that happened. The very next posting was for a new clerk's position at airport station, February 13 of 2009, to be bid citywide. That was not an in-section bid. And Audrey Henderson, not an internal person, got that bid. She requested retreat rights again to the first available vacancy at airport on June 29 of 2009. If you read in here, you go on to see that jobs were becoming vacant. Six new clerk positions, for example, went up for citywide bid November 12 of 2009. And that's six new ones at airport station. This place that was supposedly being reduced. And my client did not get any of them. And they went to persons who were not necessarily within the unit. And those were processing positions? Yes, mail processing clerk positions they were. And does the retreat right apply to jobs that are posted citywide? Yes, it does. It's a retreat right back to that station. And these all were to that station. If you read all of this, that there were a total number of 25 positions that were filled from the time that my client was taken out of that facility, airport station, at 25 opportunities that they could have gotten her back there. And I think our brief is fairly explicit on that. Why didn't she grieve all this? It seems like if it's in line with the collective bargaining agreement, she could have easily grieved it, as you say. She did grieve, Your Honor. And she got back to Memphis. She got back to airport station eventually as a result of a grievance. But we're not here about the grievance. We're here about her EEO activity. And we contend that it was the EEO activity that was causing her these problems. And we have the temporal connection developed very carefully in our brief, date by date. I could go on. I think that's all I'm going to say. All right. Thank you, Ms. Caldwell. The case will be submitted.